# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**SAMUEL WOODWARD,**

     **Plaintiff,**

**v.**                                          **Civ. No. 16-775 JCH/KK**

**SOCIAL SECURITY**
**ADMINISTRATION,**

     **Defendant.**


## <u>PROPOSED FINDINGS OF FACT AND RECOMMENDED DISPOSITION</u>

**THIS MATTER** is before the Court on three dispositive Motions filed by Defendant.

**The Court considers** *Defendant's Motion to Dismiss Plaintiff's Claims for Violation of his Weingarten Rights (Count VI and for Violation of the 14th Amendment (Count VII)*, filed January 12, 2018.  Plaintiff did not respond to this Motion, and the time within which he was permitted to do so has expired.

**The Court also considers** *Defendant's First Motion for Summary Judgment on Plaintiff's Claims for Race Discrimination (Count I)*, filed on January 12, 2018 (Doc. 49), as to which Plaintiff filed *Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment* on February 22, 2018 (Doc. 55); and as to which Defendant filed *Defendant's Reply to Her First Motion for Summary Judgment on Plaintiff's Claims for Race Discrimination (Count I)* on March 8, 2018 (Doc. 58).

Finally, **the Court considers** *Defendant's Provisional Second Motion for Summary Judgment on Plaintiff's Claims for Retaliation (Count III), Gender Discrimination (Count IV) and Hostile Work Environment (Count II/Harassment (Count V)*, filed January 16, 2018 (Doc.

52), as to which Plaintiff filed *Plaintiff's Response in Opposition to Defendant's Second Motion for Summary Judgment on Plaintiff's Claims for Retaliation (Count III), Gender Discrimination (Count IV) and Hostile Work Environment (Count II/Harassment (Count V)*, on February 28, 2018 (Doc. 57); and as to which Defendant filed *Defendant's Reply to Her Second Motion for Summary Judgment on Plaintiff's Claims for Retaliation (Count III), Gender Discrimination (Count IV) and Hostile Work Environment (Count II/Harassment (Count V)* on March 14, 2018 (Doc. 59).

The undersigned,[1] having considered the parties' submissions, the record, and the relevant law, finds that each of Defendant's Motions are well taken, and recommends that they be **GRANTED**.

## I.      General Background and Procedural History

This lawsuit arises out of Plaintiff Samuel Woodward's employment with the Social Security Administration (Defendant).   During the relevant time frame, Plaintiff was employed by Defendant at the Social Security Administration National Hearing Center in Albuquerque, New Mexico ("the Agency").  (Doc. 37 at 1-9.)  Plaintiff, who is a Hispanic male, brings this lawsuit in an attempt to recover damages incurred as a result of Defendant's alleged race-based and gender-based discriminatory animus toward him which, Plaintiff alleges, manifested in a number of unlawful employment actions.  (Doc. 49-1 at 2; Doc. 49 at 2; Doc. 55 at 2.)

Plaintiff's *Amended Complaint for Damages From Violations of Title VII, Racial Discrimination, Hostile Work Environment, Retaliation, Gender Discrimination, Harassment, 42 U.S.C. § 1983 Weingarten, Due Process* (hereafter "Complaint") comprises seven substantive

---

[1]Pursuant to an *Order of Reference Relating to Bankruptcy Appeals, Social Security Appeals, Prisoner Cases, Non Prisoner Pro Se Cases, and Immigration Habeas Corpus Proceedings* issued on September 14, 2016, by United States District Judith Herrera, the undersigned submits an analysis and recommended disposition of this Matter to United States District Judge Herrera.  (Doc. 10.)

claims. In Count I (Racial Discrimination Violations of Title VII), Plaintiff claims that because he is Hispanic and "brown-skinned in color" he was subjected to disparate treatment as demonstrated by the fact that he was given an official letter of reprimand while white employees who did similar acts were provided "warnings and cautions." (Doc. 37 at 9-10.)

In Count II (Hostile Work Environment Violations of Title VII), Plaintiff claims that Defendant (through the Agency's Chief Judge and its Administrative officer) discriminated against him by "surrounding him with severe offensive conduct, comments and postings" about Social Security Claimants, which caused Plaintiff to feel humiliated, embarrassed, and ashamed. (Doc. 37 at 7-8, 10.)

In Count III (Retaliation Violations of Title VII), Plaintiff claims that Defendant retaliated against him for filing an EEOC complaint. (Doc. 37 at 10-11.)

In Count IV (Gender Discrimination Violations of Title VII) Plaintiff claims that female employees were chosen for promotions, bonuses and extra volunteer duties, and that he was not given such opportunities as would have been commensurate with his qualifications and experience. (Doc. 37 at 10-11.)

In Count V (Harassment Violations of Title VII), Plaintiff claims that Defendant, driven by gender-based animus, created a work environment that was intimidating, hostile, or abusive by virtue of "offensive jokes, slurs, epithets or name calling, ridicule or mockery, insults or putdowns, offensive objects or pictures, and interference with work performance. (Doc. 37 at 12.)

In Count VI (Weingarten Rights Weingarten Rules for Public Employees NLRB v. Weingarten M.G.L. c. 150E) Plaintiff seeks to recover damages on the ground that Defendant "admitted" on several occasions that Plaintiff was not being investigated or subjected to any

form of disciplinary action" yet he received a letter of reprimand "contrary to 150E." (Doc. 37 at 12-13.)

Finally, in Count VII (Violations of Due Process Protection Under the 14th Amendment 42 U.S.C. § 1983), Defendant claims that he was subjected to disciplinary action without cause and deprived of due process. (Doc. 37 at 13-14.)

In three separate Motions, Defendant variously seeks dismissal or summary judgment in its favor as to each Count of the Complaint. Beginning with Defendant's Motion to Dismiss, the Court addresses each Motion in turn. Additional facts are provided as necessary in the body of this Opinion.

## II.    Defendant's Motion to Dismiss Count VI and Count VII Should Be Granted

Count VI of Plaintiff's Complaint is brought pursuant to two authorities: *N.L.R.B. v. J. Weingarten, Inc.*, 420 U.S. 251 (1975) and "M.G.L. c. 150E." (Doc. 37 at 12.) The former is a Supreme Court case that stands for the proposition that union employees have the right to union representation in investigatory interviews that the employee reasonably believes may result in disciplinary action against them. *Weingarten*, 420 U.S. at 267. The latter is an ostensible reference to the Massachusetts General Laws, governing "collective bargaining agreements; term; appropriation requests; provisions; legal conflicts, priority of agreement; review of agreement by retirement board." Mass. Gen. Laws ch. 150E § 7 (2014). Count VII of Plaintiff's Complaint is brought pursuant to the 14th Amendment to the Constitution, which prohibits any State from depriving any person of life, liberty, or property without due process of law, and 42 U.S.C. Section 1983, which provides a cause of action for those who have been deprived of Federal Constitutional Rights by persons acting under color of state law.

Defendant argues that Count VI and Count VII should be dismissed pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction because Title VII is the exclusive judicial remedy available to Plaintiff. (Doc. 50.) Plaintiff, having failed to file and serve a response in opposition to Defendant's Motion to Dismiss, has effectively consented to dismissal of these claims. *See* D.N.M..LR-Civ. 7.1(b) ("The failure of a party to file and serve a response in opposition to a motion within the time prescribed for doing so constitutes consent to grant the motion."). Plaintiff's failure to respond notwithstanding, the Court considers the viability of these claims. *Issa v. Comp USA*, 354 F.3d 1174, 1177-78 (10th Cir. 2003) (requiring the district court to consider the viability of a claim rather than granting a motion to dismiss "merely because a party failed to file a response" (alteration omitted)).

A motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) may come in one of two forms—a "facial attack" or a "factual attack." *Holt v. United States*, 46 F.3d 1000, 1002-03 (10th Cir. 1995). A facial attack, which challenges the sufficiency of the allegations in the complaint, relates to the plaintiff's obligation, under Federal Rule of Civil Procedure 8(a)(1), to demonstrate that the court has jurisdiction over the subject matter of the case. *Holt*, 46 F.3d at 1002; 5B Charles Alan Wright & Arthur Miller, Federal Practice and Procedure § 1350 (3d ed. 1998). "In reviewing a facial attack, a district court must accept the allegations in the complaint as true." *Holt*, 46 F.3d at 1002. Defendant's argument that Title VII has a preemptive effect over Plaintiff's other claims constitutes a facial attack because it challenges the sufficiency of the complaint rather than the facts upon which subject matter depends. *Mobley v. Donahoe*, 498 F. App'x 793, 796 (10th Cir. 2012) (unpublished).

Plaintiff's claims in this matter are brought against a federal agency arising out of Plaintiff's federal employment in in Albuquerque, New Mexico. (Doc. 37 at 3-9.) As Defendant correctly

argues, Title VII of the Civil Rights Act "provides the exclusive judicial remedy for claims of discrimination in federal employment." *Brown v. Gen. Servs. Admin.*, 425 U.S. 820, 835 (1976) (holding that the Civil Rights Act of 1964provides the exclusive remedy for claims of discrimination in federal employment); *Mobley*, 498 F. App'x at 796-97 (holding that because Title VII is the exclusive remedy for claims of discriminatory conduct against federal employers a former employee of the United States Postal Service was precluded from asserting employment discrimination claims pursuant to civil rights statutes or under the Constitution). Accordingly, Plaintiff's claims brought pursuant to the Fourteenth Amendment, Section 1983, and Massachusetts statutory law (which are also unsustainable on other grounds[2]) are preempted by Title VII, which provides Plaintiff's exclusive judicial remedy.

Furthermore, as to Count VI, a *Weingarten* claim must initially be pursued through the collective bargaining grievance process. *Simensen v. USPS*, EEOC Appeal No. 01A21068, *1 (Feb. 26, 2002) ("[T]he proper forum for a complainant's complaint regarding . . . *Weingarten* Rights is the negotiated grievance process, not the EEO complaint process."). Plaintiff does not allege in his Complaint, nor has he otherwise demonstrated, that he exhausted his remedies in

---

[2] As to Count VII in its entirety and as to Count VI insofar as it is premised on a violation of Massachusetts statutory law, Plaintiff's claims could otherwise be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted. *See Ramirez v. Dep't of Corr., Colo.*, 222 F.3d 1238, 1240 (10th Cir. 2000) (quotation omitted) (stating that dismissal of a complaint under Federal Rule of Civil Procedure 12(b)(6) is appropriate if "it appears beyond doubt that the plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief"). Accepting, as true, the well-pleaded factual allegations in the Complaint that bear upon this issue, the Court notes that Plaintiff, was, at all relevant times, an employee of a federal agency in Albuquerque, New Mexico, and that his claims arise from alleged discriminatory and hostile treatment perpetrated by employees of the federal agency. (Doc. 37 at 3-9) *See Burnett v. Mortgage Elec. Registration Sys., Inc.*, 706 F.3d 1231, 1235 (10th Cir. 2013) (stating that, in the context of a motion to dismiss, all well-pleaded factual allegations in the complaint are accepted as true and are viewed in the light most favorable to the non-moving party). Plaintiff has not alleged that any of the wrongful conduct was perpetrated by the State of New Mexico or by an individual acting "under color of state law," and, therefore, Plaintiff has not stated a viable claim under the Fourteenth Amendment or 42 U.S.C. Section 1983. *See Belhomme v. Widnall*, 127 F.3d 1214, 1217 & n.4 (concluding that the plaintiff's Fourteenth Amendment and Section 1983 claims against his federal employer (Air Force at Kirtland Air Force Base) failed as a matter of law because such claims are viable against state entities, not the federal government). Similarly, there is no basis in the Complaint from which to conclude that the statutory law of Massachusetts gives rise to a cause of action in this case.

accordance with the governing collective bargaining agreement. As such, Plaintiff's *Weingarten* claim is not properly before this Court. *See Paige v. Donovan*, 511 F. App'x 729, 733 (10th Cir. 2013) (unpublished) (affirming the dismissal of the appellant's *Weingarten* claim on the ground that the employee had not raised the claim in the first instance with the Federal Labor Relations Authority, and had, therefore, failed to exhaust her administrative remedies).

For the foregoing reasons, the undersigned recommends that *Defendant's Motion to Dismiss Plaintiff's Claims for Violation of his Weingarten Rights (Count VI and for Violation of the 14th Amendment (Count VII)* be **GRANTED**.

III.    **Defendant's First and Second Motions for Summary Judgment Should be Granted**

A.  **The Law Governing a Motion for Summary Judgment**

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Jones v. Kodak Med. Assistance Plan*, 169 F.3d 1287, 1291 (10th Cir. 1999); Fed. R. Civ. P. 56(a). "A disputed fact is 'material' if it might affect the outcome of the suit under the governing law, and the dispute is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *MacKenzie v. City & Cty. of Denver*, 414 F.3d 1266, 1273 (10th Cir. 2005). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000).

The movant bears the initial burden of demonstrating the absence of a genuine issue of material fact and its according entitlement to judgment as a matter of law. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670–71 (10th Cir. 1998). If the movant carries this initial burden, the

burden shifts to the nonmovant "to go beyond the pleadings and set forth specific facts that would be admissible in evidence in the event of a trial from which a rational trier of fact could find for the nonmovant." *Id.* at 671; *see MacKenzie*, 414 F.3d at 1273 ("Unsupported conclusory allegations . . . do not create an issue of fact."); *Gross v. Burggraf Constr. Co.*, 53 F.3d 1531, 1541 (10th Cir. 1995) (stating that hearsay testimony cannot be considered relevant to a motion for summary judgment because evidence offered in opposition to a motion for summary judgment must set forth such facts as would be admissible in evidence). If the nonmovant succeeds in demonstrating a "genuine dispute" as to material facts, the Court views the facts in the light most favorable to him. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009). However, "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

**B.  Defendant's Motion for Summary Judgment as to Count I**

Title VII of the Civil Rights Act of 1964 provides that it is "an unlawful employment practice for an employer . . . to . . . discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]"  42 U.S.C. § 2000e-2(a)(1).  In Count I of the Complaint, Plaintiff claims that, contrary to Title VII, Defendant subjected him to disparate treatment based upon his national origin, race, and color.  (Doc. 37 at 9-10.)  Specifically, Plaintiff claims that while he received a letter of reprimand for "alleged conduct issues," individuals who were not Hispanic or "brown-skinned in color" and who did "similar acts" to those that led to Plaintiff's reprimand were not officially reprimanded but were, instead, "provided warnings and cautions."  (Id.) Defendant argues that Plaintiff's claim fails as a matter of law because (1) Plaintiff cannot

establish a prima facie claim of race discrimination, and (2), even if Plaintiff could establish a prima facie case of discrimination, the undisputed material facts demonstrate that Defendant had "legitimate business reasons" for its actions. (Doc. 49 at 11.) As discussed next, the Court concludes that Plaintiff has established a prima facie case of discrimination. However, Defendant is entitled to summary judgment because the undisputed facts establish that Defendant had a legitimate, non-discriminatory and non-pretexual reason for officially reprimanding Plaintiff.

1. **Plaintiff Has Exhausted His Administrative Remedies Related to His Claim that Racial Discrimination Was the Underlying Cause of His Official Reprimand**

In December 2009 Defendant (via Plaintiff's supervisors at the Agency), having concluded that Plaintiff's overtime reports reflected a pattern of misrepresentation and falsification, issued a "memorandum" of official reprimand to Plaintiff, a copy of which was placed in his official personnel folder for a period not to exceed one year. (Doc. 49-9.) Among other things, the memorandum advised Plaintiff that "future acts of misconduct [would] lead to more serious forms of disciplinary action." (Doc. 49-9.) Plaintiff, who believed that the reprimand was driven by race-based discriminatory animus, filed a complaint with the Social Security Administration in February 2010, claiming that based on "his color, national origin (Hispanic), sex (male) and race (Hispanic)" he was given an official letter of reprimand. (Doc. 49-10.) At an EEOC hearing held in February 2011, the presiding Administrative Judge confirmed that Plaintiff had withdrawn his sex discrimination claim, and the only issue remaining was whether Plaintiff had been "subjected to discrimination based on his national origin, Hispanic; his race, Hispanic; or his color when . . . he was given an official letter of reprimand." (Doc. 49-11 at 2-3.) After the hearing, the Administrative Judge concluded that the evidence was insufficient to find that Plaintiff had suffered discrimination based on his race, national origin or color when he

was given a letter of official reprimand. (Doc. 49 at 9.) Plaintiff appealed this decision, and the EEOC issued its denial for Request for Reconsideration and Notice of Rights, finding that it was unable to conclude that the information submitted by Plaintiff established a violation of Title VII. (Doc. 37 at 2 ¶ 5.) Based upon the foregoing, it is undisputed that Plaintiff has exhausted his administrative remedies as to his claim that the official reprimand was driven by race-based animus. (Doc. 49 at 10.)

### 2. <u>Undisputed Material Facts Relevant to Count I</u>

The Court considers the following facts, which are material to Count I, to be undisputed.[3] Plaintiff was hired by the Agency as a legal assistant. (Doc. 49 at 2 ¶ 2; Doc. 55 at 2 ¶ 5; Doc. 49-2 at 2; Doc. 49-3 at 1¶ 1.) Candelaria Aragon, the Agency's supervisory legal assistant was Plaintiff's supervisor; Mark Dawson was the Agency's chief administrative judge; and Kim Kallio was the Agency's administrative officer. (Doc. 49-2 at 2; Doc. 49-5 at ¶ 1.) When, in February 2009, the Agency staff began working overtime Ms. Aragon told the legal assistants that overtime was authorized only for a particular task called "workup." (Doc. 49-3 at ¶ 4; Doc. 49 at 2 ¶ 4; see Doc. 55 at 2 ¶ 4.)

According to Ms. Aragon, questions about Plaintiff's overtime reporting began when another employee in the office reported to her that Plaintiff was conducting personal business while he was "in overtime status." (Doc. 49-3 at ¶ 2; Doc. 49 at 2 ¶ 5; Doc. 55 at 3 ¶ 5.) Based upon this report, Ms. Aragon compared some of Plaintiff's requests for overtime with information in the Agency's Case Processing Management System and found discrepancies, which she reported to

---

[3] Although Plaintiff variously "objects" to and partially disputes a number of the facts set forth herein, except where Plaintiff has particularly referred to admissible evidence in the record demonstrating that a fact is specifically controverted, the Court considers the fact to be undisputed pursuant to Local Rules of Civil Procedure 56.1(b) and Rule 56(c) of Federal Rules of Civil Procedure. *See Nielsen v. Price*, 17 F.3d 1276, 1277 (10th Cir. 1994) ("[P]ro se parties [are required to] follow the same rules of procedure that govern other litigants.").

Chief Administrative Law Judge Mark Dawson who, in turn, asked Kim Kallio to review Plaintiff's overtime sheets. (Doc. 49-3 at ¶ 2; Doc. 49-2 at 2 ¶ 6; Doc. 49-5 at 1 ¶ 2; see Doc. 55 at 3 ¶ 6.) According to Ms. Kallio, her review revealed "numerous discrepancies" (approximately 30) in Plaintiff's overtime reporting, which she set forth in a document titled "Summary of Overtime Reports of Samuel Woodward." (Doc. 49-4 at ¶ 4; Doc. 49-5 at ¶¶ 2, 10; Doc. 49-6; Doc. 49 at 3 ¶¶ 10, 12; see Doc. 55 at 4 ¶ 10.) Specifically, in comparing Plaintiff's overtime reports with the Agency's Case Processing Management System, Ms. Kallio found several instances of Plaintiff (1) having reportedly worked overtime to complete tasks that were actually completed by another employee, and (2) having reportedly worked overtime to complete "workup" on the same case, sometimes on multiple occasions—a circumstance for which "no legitimate reason" exists in the context of the Agency's case management system. (Doc. 49-5 at ¶¶ 8-10; Doc. 49 at 3 ¶ 12; see Doc. 55 at ¶ 12.)

According to Mark Dawson, because Plaintiff's overtime reporting discrepancies revealed Plaintiff's "systematic falsification of official records" he was first inclined to "proceed toward termination." (Doc. 49-7 at 2.) However, before he made a final decision regarding discipline, Mr. Dawson consulted Howard Goldberg, Employee Relations Specialist, GS-13, Office of Disability Adjudication and Review, Office of the Regional Chief Judge, Philadelphia Pennsylvania. (Doc. 49-8 at 1.) Mr. Dawson consulted with Mr. Goldberg regarding the appropriate disciplinary action because he had been advised by his supervisors that "whenever there was any issue having to do with personnel or possible adverse action, to consult Mr. . . . Goldberg, [who] was considered the guru . . . with regard to all of these issues." (Doc. 55 at 25.) Mr. Goldberg agreed with Mr. Dawson's inclination to terminate Plaintiff's employment, reasoning that Plaintiff "should be removed" because "[f]alsifying overtime reports is analogous

to stealing money from the government" and Plaintiff's "inappropriate behavior was done over a period of time" and was therefore "egregious enough to warrant removal."  (Doc. 49-8 at 5.)  Mr. Dawson stated that although they discussed termination, as one possible scenario, Mr. Goldberg "ha[d] no decisional or policy authority," and that he, not Mr. Goldberg, made the final decision concerning Plaintiff's discipline.  (Doc. 49-7 at 10.)

Although Mr. Dawson approximated that "51 hours of overtime charged to the Government by Plaintiff appear to have resulted at least in part from Plaintiff having engaged in activities other than proper work," he ultimately decided not to terminate Plaintiff's employment.  Instead, he decided to issue "[a]n official letter of reprimand" which, Mr. Dawson reasoned, "was . . . the least severe form of discipline that would convey the seriousness of the offense committed."  (Doc. 49 at 5 ¶¶ 20, 22; Doc. 49-7 at 4; see Doc. 55 at ¶¶ 20, 22 (citing Doc. 55 at 25-31).)  According to Mr. Dawson, this decision conformed with "the principle of escalating punishment, and [arose from] a desire to salvage [Plaintiff as an] employee[.]" (Doc. 49-7 at 2; Doc. 49 at 3 ¶ 13, 5 ¶ 20; see Doc. 55 at 5 ¶ 13, 5 ¶ 50 (citing Doc. 55 at 25 & 35).)  Ms. Aragon issued an "official reprimand" to Plaintiff on December 10, 2009, which was memorialized in a memorandum.  (Doc. 49-9; see Doc. 49 at 5 ¶ 21 (citing Doc. 55 at 25-31).)  A copy of the memorandum of official reprimand was placed in Plaintiff's personnel folder for a period not to exceed one year, and was the only form of discipline that Plaintiff incurred for the overtime discrepancies.  (Doc. 49 at 5 ¶ 23; Doc. 55 at 7 ¶ 23; Doc. 49-2 at 7.)

Another employee, a white male named Brian Younkin also had irregularities in his overtime sheets—specifically, Mr. Younkin had listed one case on his overtime sheets, several days apart.  (Doc. 49-4 at ¶ 4; Doc. 49 at 5 ¶ 25; Doc. 55 at 8-9 ¶ 25; Doc. 55 at 27.)  Mr. Younkin was not formally reprimanded.  Instead, Mr. Dawson sent Mr. Younkin an email warning him to "be

careful" because irregularities on overtime reports is a "sensitive issue." (Doc. 55 at 27; Doc. 49-7 at 6-7.) Mr. Dawson ascribed the difference in his treatment of Mr. Younkin from his treatment of Plaintiff to the magnitude of their respective misconduct. Mr. Dawson explained that Mr. Younkin's overtime irregularities involved one case name that was listed on his overtime sheets several days apart, whereas Plaintiff's overtime sheets revealed thirty different case names with overtime discrepancies. (Doc. 49-4 at 1-2; see Doc. 49-7 at 6-7; Doc. 55 at 8 ¶ 25; Doc. 55 at 27; Doc. 49 at 5 ¶ 25.) Mr. Dawson expressly denied discriminating against Plaintiff on any basis, including his race, national origin, or color. (Doc. 49 at 6 ¶ 28; Doc 49-4 ¶ 3; see Doc. 55 at 10 ¶ 28.)

On May 13, 2009, Ms. Aragon issued a "Memorandum of Warning" to an unnamed white female employee concerning the employee's travel card delinquencies, her rude and disrespectful comments in the workplace, deficiencies in interpersonal skills, timesheet irregularities (unrelated to overtime reports), and violation of policy concerning printing personal documents at work. (Doc. 49-4 at ¶ 5; Doc. 49 at 6 ¶ 27; see Doc. 55 at 9 ¶ 27; Doc. 55 at 29-31.) Less than two months later, on July 7, 2009, Mr. Dawson terminated the white female employee on the same grounds enumerated in the memorandum of warning. (Doc. 49-4 at ¶ 5.)

### 3.  The Analytical Framework Governing a Disparate Treatment Claim

The Court's analysis of a complaint of discrimination in employment is governed by the burden shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-06 (1973)[4]; *see EEOC v. PVNF, LLC*, 487 F.3d 790, 800 (10th Cir.

---

[4] Plaintiff suggests that the Court does not need to rely on the *McDonnell Douglas* burden shifting analysis because he has shown "direct evidence of race discrimination." (Doc. 55 at 12.) Although Plaintiff is correct in his assertion that the *McDonnell Douglas* test does not apply in circumstances in which the plaintiff presents direct evidence of discrimination, Plaintiff has not presented direct evidence of discrimination. *See Trans World Airlines, Inc. v. Thurston* , 469 U.S. 111, 121 (1985) ("[T]he *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination."). "Direct evidence is evidence from which the trier of fact may conclude, without inference, that the employment action was undertaken because of the employee's protected status." *Sanders*

2007) (employing the *McDonnell Douglas* burden shifting framework a "disparate treatment" claim of sex discrimination under Title VII). In the context of a disparate treatment claim, the prima facie case of discrimination "must consist of evidence that (1) the victim belongs to a protected class; (2) the victim suffered an adverse employment action; and (3) the challenged action took place under circumstances giving rise to an inference of discrimination." *PVNF, LLC*, 487 F.3d at 800. In other words, a plaintiff is required to demonstrate that his employer treated him "less favorably than others because of a protected trait. *Ricci*, 557 U.S. at 577 (alterations and citation omitted) ("Disparate-treatment cases present the most easily understood type of discrimination, and occur where an employer has treated a particular person less favorably than others because of a protected trait." (Citation omitted)). "The burden of establishing a prima facie case of disparate treatment is not onerous." *Texas Dep't of Cmty Affairs v. Burdine*, 450 U.S. 248, 253 (1981)

"Once the plaintiff establishes a prima facie case of discrimination, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse action." *PVNF, LLC*, 487 F.3d at 800. If the employer carries this burden, the presumption of discrimination raised by the prima facie case is rebutted, *Burdine*, 450 U.S. at 255, and the "burden shifts back to the plaintiff to show that there is a genuine issue of material fact as to whether the employer's proffered reasons are pretextual." *PVNF, LLC*, 487 F.3d at 800. The plaintiff may succeed in demonstrating pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256.

---

*v. Sw. Bell Tel., L.P.*, 544 F.3d 1101, 1105 (10th Cir. 2008). Here, Plaintiff maintains that race discrimination may be *inferred* based upon the alleged differences in Defendant's treatment of him versus his similarly situated, non-Hispanic colleagues. He has presented no direct evidence of Defendant's racial animus.

**4.** **Plaintiff Has Carried His Burden of Establishing a Prima Facie Case of Race Discrimination**

As to the first element of the prima facie case, it is undisputed that Plaintiff is Hispanic and, therefore, he is a member of a protected class under Title VII. (Doc. 49 at 11-12, 2 ¶ 1; Doc. 49-1 at 2; Doc. 55 at 2 ¶ 1.) *See Asebedo v. Kan. State Univ.*, 559 F. App'x 668, 670-71 (10th Cir. 2014) (unpublished) (recognizing that "Hispanic" constitutes a protected class pursuant to Title VII); *see also Vill. of Freeport v. Barrella*, 814 F.3d 594, 607 (2d Cir. 2016) (holding that a claim of discrimination based on Hispanic ethnicity may be cognizable under Title VII under the rubric of national-origin discrimination or "race" discrimination depending on the circumstances of the case).

As to the second element of the prima facie case, Defendant argues that Plaintiff cannot prove that he suffered an "adverse employment action." (Doc. 49 at 12.) Although it is undisputed that Plaintiff received an official reprimand and that a memorandum of official reprimand was placed in Plaintiff's personnel file for a period not to exceed one year (Doc. 49-9; Doc. 49 at 5 ¶ 2; Doc. 55 at 7 ¶ 21), Defendant argues that "not everything a supervisor says or does amounts to an adverse employment action just because the employee dislikes or disagrees with it." (Doc. 49 at 12.) Defendant argues, further, that the official reprimand did not result in a "materially adverse change to [Plaintiff's] employment" and therefore, as a matter of law, it was not an "adverse employment action." (Doc. 49 at 12.) In support of this proposition, Defendant cites *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 532 (10th Cir. 1998).

In *Sanchez*, the Tenth Circuit Court of Appeals discussed the meaning of the phrase "adverse employment action" in the context of Title VII and Age Discrimination in Employment claims. *Id.* at 532. Noting that the "Tenth Circuit liberally defines the phrase 'adverse employment action[,]'" the court observed that "[s]uch actions are not simply limited to

monetary losses in the form of wages or benefits." *Id.* Nevertheless, "a mere inconvenience or an alteration of job responsibilities" does not necessarily constitute an adverse employment action." *Id.* Thus, employment actions that are alleged to be "adverse" in the context of discrimination claims should be examined on a "case-by-case" basis considering the unique factors relevant to the situation at hand. *Id.* Applying these standards, the court concluded that the appellant in the case before it—an elementary school teacher who had been transferred to another school for a period of one year had not suffered an "adverse employment action" as that term is legally defined. *Id.* The court reasoned that although the transfer had caused the appellant some inconvenience by increasing her commute to work, her salary and benefits remained the same, she continued to teach at the elementary school level and she would continue to be employed in the same capacity after the one year period[.]" *Id.* Thus, "despite her personal discomfort" the appellant, having experienced "a purely lateral transfer" could not satisfy the "adverse employment" condition necessary to establish a prima facie case of discrimination. *Id.*

Defendant posits that, in this case, "Plaintiff suffered no materially adverse change to his employment as a result of the letter of reprimand" because, beyond the placement of the memorandum of official reprimand in his personnel file, Plaintiff did not suffer any employment consequences. (Doc. 49 at 12.) Plaintiff refutes this contention, and asserts, in relevant part, that the reprimand adversely affected his employment record which, until he was officially reprimanded, was "a perfect record, [with] good performance reports, awards and citations." (Doc. 55 at 7 ¶ 24.) Additionally, Plaintiff stated in a deposition that although he does not know whether it was a consequence of the reprimand, he was twice passed over for promotions after being reprimanded. (Doc. 49-2 at 7.)

While the record does not reflect that Plaintiff suffered tangible, material changes in his employment after he was officially reprimanded, a reasonable jury could conclude that the memorandum of official reprimand, of itself, constituted an adverse action. Among other things, the memorandum of official reprimand admonished Plaintiff that his supervisor's confidence in his honesty and integrity were shaken, and it included an advisory that "***future acts of misconduct will lead to more serious forms of disciplinary action***." The increased likelihood of "more serious forms of disciplinary action" and a reduction in Plaintiff's standing with his supervisor is sufficient to constitute an adverse employment action. *See Wells v. Colo. Dep't of Transp.*, 325 F.3d 1205, 1215 (10th Cir. 2003) (concluding that the "failure to assign a project immediately to an engineer who has unexpectedly become available" is not a "materially adverse" employment action because it "is *not a reflection on the engineer's quality of work and does not diminish the engineer's status*" (emphasis added)); *Roberts v. Roadway Exp., Inc.*, 149 F.3d 1098, 1104 (10th Cir. 1998) (holding that written warnings which ostensibly had "no adverse effect on the terms and conditions of" an employee's employment were sufficient to constitute adverse action because the record reflected that "the more warnings an employee received, the more likely he or she was to be terminated for a further infraction"); *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1060 (8th Cir. 1997) (indicating that the placement of negative reports and written reprimands in an employee's personnel file are among the "kind of serious employment consequences that adversely affect[] or undermine[]" an employee's position, even if he is not discharged, demoted or suspended). Thus, Plaintiff having submitted evidence that he suffered an adverse employment action, has satisfied the second element of a prima facie case of discrimination.

The third element, whether "the challenged action took place under circumstances giving rise to an inference of discrimination," *PVNF, LLC*, 487 F.3d at 800, "will be satisfied by proof that the employer treated similarly situated [non-minority] employees more favorably." *Hysten v. Burlington N. & Santa Fe Ry. Co.*, 296 F.3d 1177, 1181 (10th Cir. 2002). At the prima facie stage of the analysis, discriminatory intent or motive "can be inferred from the mere fact of differences in treatment." *McAlester v. United Air Lines, Inc.*, 851 F.2d 1249, 1260 (10th Cir. 1988).

Defendant argues that Plaintiff cannot satisfy the third element of the prima facie case of his race discrimination claim because there is no factual basis from which to infer that Plaintiff's race was the motivating factor behind his official reprimand. (Doc. 49 at 13.) Defendant argues, to the contrary, that this element is satisfied by evidence demonstrating that two white employees (*i.e.* the unnamed white female and Mr. Younkin) who violated work rules were treated more favorably than him in that they were warned instead of formally disciplined. (Doc. 55 at 5 ¶ 13, 7 ¶ 22, 8 ¶ 25; 9 ¶ 27; see Doc. 55 at 27-31.)

The burden imposed on a plaintiff at the prima facie stage is "not onerous," *Burdine*, 450 U.S. at 253, and may be satisfied by a "small amount of proof." *EEOC v. Flasher Co., Inc.*, 986 F.2d 1312, 1318 ("The presumption arising under the first prong of [the] *McDonnell Douglas* [framework] is a relatively weak inference that corresponds to the small amount of proof necessary to create it."). The evidence before the Court demonstrates that at least one non-Hispanic employee (Mr. Younkin) whose overtime sheets reflected irregularities was warned by Mr. Dawson via email to "be careful," while irregularities in Plaintiff's overtime reporting led Mr. Dawson and Ms. Aragon to formally reprimand him. It is reasonable to conclude that the white employee having been informally warned instead of officially reprimanded, was treated

more favorably than Plaintiff. On this basis alone, Plaintiff has satisfied the third element of the prima facie case of discrimination. *See E.E.O.C. v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1197 (10th Cir. 2000) (holding that evidence that at least one employee who was not in the protected class was treated more favorably than the protected employee is sufficient to establish a prima facie case of disparate treatment); *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 646 (3rd Cir. 1998) (recognizing that a plaintiff's relaxed burden of proof at the prima facie stage where the inquiry is based upon "a few generalized factors" may be acceptably satisfied by singling out one person not within the protected class who was treated more favorably than the protected employee, and is, thus unlike the burden at the pretext stage which requires greater specificity).

**5.** **Defendant Has Demonstrated a Legitimate, Non-Discriminatory Reason for Formally Reprimanding Plaintiff**

Because Plaintiff has carried the initial burden of establishing a prima facie case of race discrimination, the burden shifts to Defendant to articulate a legitimate, nondiscriminatory reason for having officially reprimanded Plaintiff. *PVNF, LLC*, 487 F.3d at 800. In other words, Defendant must "clearly set forth, through the introduction of admissible evidence, the reasons for" that action. *Burdine*, 450 U.S. at 255. This step of the *McDonnell Douglas* analysis is not "comparative," that is, "[i]t does not require the defendant to explain any differences in treatment between the plaintiff and others"; instead, it "only requires that the defendant explain its actions against the plaintiff in terms that are not facially prohibited by Title VII." *Flasher Co., Inc.*, 986 F.2d at 1317-18 (10th Cir. 1992) ("It is only *unexplained discipline,* not *unexplained disparities,* that will justify judgment in favor of the plaintiff under the second prong of *McDonnell Douglas.*"). Defendant has carried this burden.

The undisputed material facts show that Ms. Kallio reviewed Plaintiff's overtime sheets with the Agency's Case Processing Management System and found numerous overtime discrepancies, including instances of Plaintiff having submitted overtime requests for work that had been completed by other employees and multiple overtime requests related the same task "workup" in the same case—for which no legitimate explanation existed. These discrepancies were present in approximately thirty cases, and in Mr. Dawson's estimation, the discrepancies reflected a "systematic falsification of official records" warranting severe disciplinary action including—as was his first inclination—termination of Plaintiff's employment. Mr. Goldberg, a person with some expertise in personnel matters, reasoned that Plaintiff's infractions, having been committed over a period of time were sufficiently egregious to warrant termination and were akin to stealing from the government. Rather than terminating Plaintiff's employment, Mr. Dawson concluded that an official letter of reprimand, which he described as "the least severe form of discipline that would convey the seriousness of the offense committed[,]" was appropriate. The nature and extent of Plaintiff's overtime discrepancies constitute a facially nondiscriminatory reason for Defendant having officially reprimanded Plaintiff.

6. **Plaintiff Has Not Demonstrated that Defendant Used Overtime Discrepancies as Pretext for Racial Discrimination**

Defendant having provided legitimate, facially nondiscriminatory reasons for officially reprimanding Plaintiff, the "burden shifts back to the plaintiff to show that there is a genuine issue of material fact as to whether the employer's proffered reasons are pretextual." *PVNF, LLC*, 487 F.3d at 800. A plaintiff may show pretext in a number of ways, including for example, by presenting "evidence that [the] defendant's stated reason for the adverse employment action was false"; by presenting evidence that "the defendant acted contrary to a written company policy proscribing the action taken by the defendant under the circumstances"; or by presenting

evidence that "he was treated differently from other similarly-situated employees who violated work rules of comparable seriousness." *Salguero v. City of Clovis*, 366 F.3d 1168, 1176 (10th Cir. 2004). Of these examples, the latter is especially relevant. *McDonnell Douglas Corp.*, 411 U.S. at 804 ("Especially relevant to . . . a showing [of pretext] would be evidence that white employees involved in acts against [the defendant] of comparable seriousness" were treated more favorably than the plaintiff was treated.).

In support of his position that Defendant's proffered reasons for officially reprimanding him were a pretext for race-based discrimination, Plaintiff relies, primarily[5] upon the evidence demonstrating that the unnamed white female employee and Mr. Younkin (to whom he variously refers as "comparative white" male/female) received warnings, whereas Plaintiff received an official reprimand without having first been warned. (Doc. 55 at 8-10.) For example, Plaintiff argues that

> The comparative white female was terminated for comparative offenses including overtime discrepancies, however, she was afforded a warning before she continued her behavior and was subsequently terminated. The Plaintiff was advised of the allegations and immediately deceased [sic] submitting overtime sheets for the same claimants on different days. A comparative white male employee committed the same allegations, who was Mark Dawson's legal assistant throughout his tenure at the Albuquerque NHC, (while other legal assistants were consistently rotated and continue to this day), was given a courtesy of a [sic] email warning him that an 'audit of the LA's OT sheets has

---

[5] Plaintiff also seeks to establish pretext by arguing that he was deprived of documentation that, in his view, would have allowed him to prove that the allegations of overtime discrepancies underlying the official reprimand were false and/or would have allowed him to demonstrate that other legal assistants (including and particularly) Mr. Younkin did not have overtime discrepancies of equal magnitude to those for which Plaintiff was reprimanded. Defendant has provided admissible evidence related to its underlying decision to discipline Plaintiff, and even if that decision turned out to be mistaken that would not necessarily demonstrate pretext. *See Kendrick v. Penske Transp. Servs. Inc.*, 220 F.3d 1220, 1233 (10th Cir. 2000) (It is not the role of the Court "to act as a super personnel department" that second guesses an employer's business judgment.); *Flasher Co., Inc.*, 986 F.2d at 1322 n.12 ("[A] mistaken belief can be a legitimate reason for an employment decision and is not necessarily pretextual."); *Branson v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir. 1988) (A plaintiff's "mere conjecture that [his] employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment"; "[i]t is the perception of the decision maker which is relevant, not [the] plaintiff's perception of [himself]"). In any event, and to the extent that Plaintiff suggests that he was unfairly deprived of necessary discovery, the Federal Rules of Civil Procedure provide processes by which a litigant may pursue relief related to discovery, and Plaintiff has not filed any discovery-related motions.

revealed some irregularities in your sheets' . . . but because these employees were Caucasian, Dawson did not seek their immediate termination or issue a reprimand, pretext to hide discrimination.

(Doc. 55 at 9-10 ¶ 27.)  Plaintiff reiterates this argument, with slight variations, throughout his response to Defendant's motion for summary judgment, arguing, also as to the unnamed white female and to Mr. Younkin, that Mr. "Dawson refused to discipline two white employees" as evidenced by the fact that "the male employee received an email warning him not to do it again . . . while the female received a warning letter[.]"  (Doc. 55 at 5 ¶ 13.)  And arguing, further, that Mr. "Dawson warned another similarly situated white male employee through email of the offenses committed with no disciplinary action and a letter of warning to a similarly situated white female who committed the same offenses."  (Doc. 55 at 7 ¶ 22.)

This evidence does not give rise to a genuine issue of fact concerning the comparable seriousness of Plaintiff's overtime reporting discrepancies and the rule violations committed by the two white employees.   As to the unnamed white female employee, the record reflects that Ms. Aragon met with the employee to discuss her "ongoing pattern of discourteous and disrespectful behavior, misconduct, and poor job performance."  (Doc. 55 at 29.)  There is no evidence in the record that the white female employee had engaged in misconduct related to overtime reporting and, to the extent that the evidence reflects that she committed a timesheet infraction, there is no evidence to suggest that she had engaged in a pattern of such misconduct preceding the warning.   To that end, the Court notes that among the enumerated incidents of misconduct was that the employee had "on at least one occasion improperly amended a timesheet in an attempt to erase [her] tardiness" in returning from lunch.  (Doc. 55 at 30.)  As to Mr. Younkin, the record reflects that he was warned after Mr. Dawson discovered that he had listed *one* case on his overtime sheets, several days apart.

On the other hand, Plaintiff was found to have engaged in "systematic falsification" of his overtime reporting sheets related to thirty cases including having reported working overtime to complete tasks that were completed by other employees, and having illegitimately reported doing "workup" on the same case on multiple occasions. Plaintiff's multiple infractions, which occurred over a period of time, and which could have, but did not, result in his termination, are not reasonably comparable to the single instances of time-sheet[6] or overtime reporting infractions committed by his comparative colleagues such that a reasonable jury could infer that Defendant was driven by racially discriminatory animus in giving Plaintiff an official reprimand without first providing a "warning." *See Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1110, 1121 (10th Cir. 2007) (concluding that a bank employee who was terminated for refunding at least $1,099 worth of overdraft fees in bank accounts belonging to her subordinates whereas another bank employee who reversed overdraft charges on her own account on two separate occasions only received a written warning was not relevant to a disparate treatment claim because the seriousness of the infractions was not comparable); *Trujillo v. Huerfano Cty. Bd. of Cty. Comm'rs*, 349 F. App'x 355, 365 (10th Cir. 2009) (unpublished) (concluding that an employee who was terminated after he had multiple safety violations, two of which occurred within a few days of each other could not show disparate treatment by pointing evidence that other employees, involved in single accidents, were not disciplined because there was no evidence that the employers considered instances of a single accident to be of comparable seriousness to multiple, successive, safety violations).

---

[6] As to the other issues about which the white female employee was warned (discourteous and disrespectful workplace behavior, misconduct, and poor job performance) there is no evidence in the record to suggest that these issues are of "comparable seriousness" to systematically falsifying overtime reports which, as Mr. Goldberg stated, is akin to "stealing money from the government."

Furthermore, to the extent that the unnamed white female was ultimately discovered to have continued the inappropriate work-place practices for which she was warned (including, presumably, amending her time-sheets), her employment was terminated less than two months after she was warned. (Doc. 55 at 29; Doc. 49-4 at ¶ 5.) That the white female employee was terminated for engaging in a pattern of misconduct, while Plaintiff was merely reprimanded, controverts rather than supports an inference of race discrimination.

### 7. <u>Recommendation of Summary Judgment in Defendant's Favor as to Count I</u>

Defendant having demonstrated a legitimate, non-discriminatory basis for officially reprimanding Plaintiff, and Plaintiff having not presented evidence sufficient to give rise to a genuine issue of fact as to whether the reason was pretext for racial discrimination, summary judgment in favor of Defendant should be granted as to Count I.

### 8. <u>Plaintiff's Race-Based Hostile Work Environment Claim Should be Dismissed</u>

In the Complaint, Plaintiff claims that he was subjected to a "hostile work environment" based upon several alleged instances of Mr. Dawson having made offensive and derogatory comments about persons with disabilities, females, and overweight or obese persons; and having also made sexually offensive comments related variously to a homosexual, a prostitute, and a Social Security claimant who had purportedly engaged in sexual intercourse with a prison guard while she was incarcerated. (Doc. 37 at ¶¶ 30, 49-52.) Plaintiff did not allege that Mr. Dawson or any other person in the Agency made racially harassing or racially derogatory comments. Nor did Plaintiff pursue a race-based hostile work environment claim before the EEOC. (See Doc. 58 at 8; Doc. 52-2; Doc. 52-3; Doc. 49-10.) Nevertheless, in his Response to Defendant's motion for summary judgment as to Count I, Plaintiff argues that he was subjected to a racially

hostile work environment.[7]   (Doc. 55 at 13.)   Defendant argues that this claim should be dismissed based upon Plaintiff's failure to exhaust his administrative remedies.  (Doc. 58 at 8)  The Court agrees.[8]

"Exhaustion of administrative remedies is a jurisdictional prerequisite to suit under Title VII." *Jones v. Runyon*, 91 F.3d 1398, 1399 (10th Cir. 1996); *Jones v. U.P.S., Inc.*, 502 F.3d 1176, 1183 (10th Cir. 2007). "A plaintiff's claim in federal court is generally limited by the scope of the administrative investigation that can reasonably be expected to follow the charge . . . submitted to the EEOC." *MacKenzie*, 414 F.3d at 1274.   The Court "liberally construe[s] charges filed with the EEOC in determining whether administrative remedies have been exhausted as to a particular claim." *Jones v. U.P.S. Inc.*, 502 F.3d at 1186.   "This more lenient pleading standard contemplates the fact that administrative charges of unlawful employment practices are regularly filled out by employees who do not have the benefit of counsel." *Mitchell v. City and County of Denver*, 112 Fed.Appx. 662, 667 (10th Cir. 2004).   "The failure to mark a particular box creates a presumption that the charging party is not asserting claims represented by that box." *Jones v. U.P.S. Inc.*, 502 F.3d at 1186.   "The presumption may be rebutted, however, if the text of the charge clearly sets forth the basis of the claim." *Id.*

---

[7] To the extent that the race-based hostile work environment argument in Plaintiff's response may be construed as a request to amend the complaint, and because Defendant has had an opportunity to address it, the Court addresses this issue and notes, for the reasons discussed herein that such an amendment would be futile.  *See Viernow v. Euripides Dev. Corp.,* 157 F.3d 785, 790 n. 9 (10th Cir.1998) ("Issues raised for the first time in a plaintiff's response to a motion for summary judgment may be considered a request to amend the complaint pursuant to Fed.R.Civ.P. 15."); *Martinez v. Potter*, 347 F.3d 1208, 1212 (10th Cir. 2003) (stating that the permissibility in the Tenth Circuit of seeking to amend a complaint by raising new arguments in response to a motion for summary judgment does not preclude the summary judgment movant from an opportunity to be heard on whether the amendment should be permitted).

[8] Even were the Court to evaluate Plaintiff's race-based hostile work environment claim, this claim would fail on the merits because Plaintiff has not submitted any evidence demonstrating that Mr. Dawson's offensive comments were "racial or stem[med] from racial animus."  (Doc. 55 at 10 ¶¶ 32-33 (citing Doc. 55 at 58-61).)  *Tademy v. Union Pac.Corp.*, 614 F.3d 1132, 1138-39 (10th Cir. 2008) (stating that to prevail in a racially-hostile-work-environment claim, the plaintiff must demonstrate that the harassment must be "racial or stem from racial animus" (alteration omitted)).

While the record reflects that Plaintiff exhausted his administrative remedies in regard to some claims, it is devoid of evidence that Plaintiff's race-based hostile work environment was raised on the form of his complaint or in the text of his charge and supporting addendum in any manner that would have prompted an investigation of such a claim. It is unsurprising then that Plaintiff's race-based hostile work environment claim was not investigated in the administrative proceedings. Plaintiff's race-based hostile work environment claim is not properly before the Court. *Runyon*, 91 F.3d at 1401 ("Exhaustion of administrative remedies is required before a plaintiff may bring a federal action."). Accordingly, to the extent that Plaintiff has brought a race-based hostile work environment claim, the undersigned recommends that it be dismissed for lack of jurisdiction. *Id.* at 1399.

### C. Defendant's Motion for Summary Judgment as to Counts II, III, IV, and V

### 1. Plaintiff Failed to Exhaust His Administrative Remedies as to Count II and Count III

As noted above, a plaintiff is required to exhaust his administrative remedies before filing a lawsuit against his employer for violations of Title VII. *Runyon*, 91 F.3d at 1399, 1401. For federal employees, such as Plaintiff, the administrative process is governed by regulation. Of relevance here, 29 C.F.R. Section 1614.105, governing "Pre-complaint processing" requires an aggrieved person who believes he has been subjected to employment discrimination on any basis prohibited in Title VII, attempt to resolve the matter "informally" (prior to filing a complaint) by consulting a "Counselor" within 45 days of the alleged discriminatory action. 26 C.F.R. § 1614.105(a)(1). At the initial counseling session, the Counselor must advise the aggrieved individual in writing of his rights and responsibilities in pursuing his grievance. 29 C.F.R. § 1614.105(b)(1); *see* 29 C.F.R. § 1614.108(a) (requiring the federal agency against which the complaint has been filed to conduct an investigation of the complaint); 29 C.F.R § 1614.301

(governing the procedures available to an individual who is covered by a collective bargaining agreement); 29 C.F.R. § 1614.302 (governing the procedures available to an individual who has a "mixed case complaint"). If the matter is not resolved, the Counselor is required to advise the aggrieved individual of his right to file a formal Equal Employment Opportunity (EEO) complaint of discrimination, and the aggrieved individual must file a complaint within fifteen days of being so advised. 29 C.F.R. § 1614.105(d); 29 C.F.R. 1614.106 (governing the formal complaint process). After an investigation, the aggrieved individual may request a hearing before an administrative judge. 29 C.F.R. § 1614.108(h); *see* 29 C.F.R. § 1614.109 (governing administrative hearings). Within forty days of the administrative judge's decision, the employing agency must take "final action" on the complaint. 29 C.F.R. § 1614.110(a). If the aggrieved individual is not satisfied with the outcome of the final action taken by the employing agency, he may appeal the final action to the Equal Employment Opportunity Commission or file a civil action in federal district court. 29 C.F.R. § 1614.110(b). Failure to exhaust these or any applicable administrative remedies deprives this Court of jurisdiction over the employment discrimination claim, and compels the Court to grant summary judgment in favor of the employing agency. *Runyon*, 91 F.3d at 1399; *see, e.g.*, *Dimsdale v. Peters*, 217 F. App'x. 743, 746 (10th Cir. 2007) (unpublished) (holding that the district court was compelled to grant summary judgment in favor of the Secretary of the Department of Transportation based upon the plaintiff's failure to comply with 29 C.F.R. § 1614.105(a)(1)).

The following facts are undisputed. On July 15, 2014, Plaintiff contacted a Counselor with the Social Security Administration EEO to complain that as a result of disparate treatment based on his gender, he had not received a monetary performance award on July 3. (Doc. 52-1 at 2-3.) The Counselor noted that Plaintiff complained that he and his three male colleagues had not

received awards, whereas their female colleagues had received awards, and that this was consistent with "a long history of disparate treatment and favoritism" within the Agency. (Doc. 52-1 at 3; Doc. 52 at 2 ¶ 4; Doc. 57 at 2 ¶ 4.) The allegation that, because Plaintiff is male, he did not receive a monetary award comprised the only basis of this complaint. (Id.) On October 17, 2014, Plaintiff filed a formal charge of discrimination with the Social Security Commission of Civil Rights and Equal Opportunity (CREO) complaining of non-sexual harassment, hostile work environment, and disparate treatment. (Doc. 52-2; Doc. 52 at 3 ¶ 5; Doc. 57 at 2 ¶ 5.) Plaintiff's brief description of his claim (with a longer version provided in an accompanying narrative) was that he had "been passed up or given substantially less on a yearly basis for monetary awards by the administration run by ALJ Pardo from 2010 to 2014 when he assumed duties of chief administrative law judge." (Doc. 52-2 at 2; Doc. 52 at 3 ¶ 6; Doc. 57 at 2 ¶ 6.) In a letter dated January 29, 2015, CREO advised Plaintiff that it was accepting the following claim: "Whether [Plaintiff] was subjected to nonsexual harassment on the basis of sex (male) when from 2012-2014, [Plaintiff] did not receive monetary awards or received substantially less than coworkers." (Doc. 52-3; Doc. 52 at 3 ¶ 8; Doc. 57 at 2 ¶ 8.) On May 19, 2016, CREO issued a final agency decision indicating that it was unable to conclude that the information submitted by Plaintiff established a violation of Title VII. (Doc. 37 ¶ 8; Doc. 52 at 3 ¶ 9; Doc. 57 at 2 ¶ 9) This notice gave rise to Plaintiff's right to file a lawsuit in Federal District Court. 29 C.F.R. § 1614.110(b).

Based upon foregoing, Defendant argues that Plaintiff's hostile work environment claim (Count II); his claim of retaliation (Count III); and his harassment claim (Count V) are barred for lack of jurisdiction because Plaintiff did not exhaust his administrative remedies as to these claims. (Doc. 52 at 8-14.) Thus, Defendant argues, the only remaining claim properly before the

Court is whether Plaintiff suffered unlawful gender discrimination in July 2014 when he did not receive a "bonus."  (Doc. 52 at 11.)  Plaintiff provides no argument or evidence to the contrary. (Doc. 57 at 5.)  Based upon a review of the record, and for the reasons discussed next, the Court concludes that Defendant's position is correct as to Count II and Count III, but not as to Count V.

In Count II of the Complaint, Plaintiff alleges that he was subjected to a hostile work environment as a result of "severe offensive conduct, comments and posting."  (Doc. 37 at 50.) In support of this claim, Plaintiff alleges in the Complaint that Mr. Dawson made several offensive comments about Social Security claimants (as discussed earlier), and that Ms. Kallio posted an offensive joke on her door bulletin that read: "Why do they put Braille dots on the keypad of the drive-up ATM?". (Doc. 37 at ¶¶ 30, 49-52.)  The record reflects that Plaintiff did not raise this issue with the EEO Counselor as required by 29 C.F.R. Section 1614.105. (Doc. 52-1.)  Further, although Plaintiff complained of a "hostile work environment" in his formal EEO complaint, neither Mr. Dawson's offensive comments nor the offensive joke posted by Ms. Kallio comprised any part of this complaint.  (Doc. 52-2.) In sum, there is no evidence in the record demonstrating that Plaintiff exhausted his administrative remedies as to the hostile work environment claim in Count II.   *MacKenzie*, 414 F.3d at 1274 ("A plaintiff's claim in federal court is generally limited by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination submitted to the EEOC.").  Likewise, as to Count III (retaliation), the record is devoid of evidence that Plaintiff raised a claim of retaliation at any stage of the administrative proceedings.  (Doc. 52-1; Doc. 52-2.) [9]

---

[9] Furthermore, except for a conclusory allegation in the Complaint that there is a "causal connection" between Plaintiff's filing an EEO complaint and his experience of a hostile work environment and discrimination, Plaintiff has not submitted any evidence, or made any argument, in support of this claim.

Based upon the foregoing, the Court recommends that Count II and Count III be dismissed for lack of jurisdiction based upon Plaintiff's failure to exhaust his administrative remedies.

Regarding Count V, while the record before the Court is devoid of evidence that Plaintiff raised these claims with the EEO Counselor as required by 29 C.F.R. Section 1614.105, and the Court could recommend summary judgment on that basis alone, in Plaintiff's formal EEO complaint, he included a claim of "non-sexual harassment, hostile work environment, [and] favor[i]tism." (Doc. 52-2 at 2.) And, in the narrative accompanying the formal complaint, Plaintiff described a number of work-place incidents in which he was treated unfavorably— including having been disparaged by his supervisors, having been treated poorly as compared with his female colleagues, and having been disadvantaged by a "pattern of favoritism." (Doc. 52-2 at 3-9.) Accordingly, the Court addresses Defendant's argument that it is entitled to summary judgment on Count V based on the merits of that claim later in this Opinion.

### 2. **Defendant's Motion for Summary Judgment as to Count IV**

In Count IV of the Complaint, Plaintiff claims that contrary to Title VII, he (along with other male employees who are not parties in this litigation) was subjected to gender discrimination by virtue of having been denied promotions, bonuses, and "extra volunteer duties" for which female employees with commensurate experience and qualifications were chosen. (Doc. 37 at ¶¶ 58-62.) Defendant argues that it is entitled to summary judgment as to this claim because Plaintiff cannot demonstrate that Defendant "is one of those unusual employers [that] discriminates against the majority." (Doc. 52 at 14.) And, as such, he cannot establish a prima facie case of gender discrimination. (Id.) Plaintiff, having provided no substantive argument and scant evidence to the contrary, does little to refute this argument. (Doc. 57.) For the reasons that follow, the Court recommends that Defendant's motion be granted.

1. **The Governing Legal Framework**

Although "Title VII was enacted to ensure equality of employment opportunities and to eliminate those practices and devices that have historically discriminated on the basis of race, sex, color, religion, or national origin[,]" it also "prohibits discrimination against groups that historically have not been socially disfavored." *Livingston v. Roadway Exp., Inc.*, 802 F.2d 1250, 1251-52 (10th Cir. 1986). Nevertheless, "the presumptions in Title VII analysis that are valid when the plaintiff belongs to a disfavored group are not necessarily justified when the plaintiff is a member of [a] historically favored group." *Id.* at 1252; *see also Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1149 (10th Cir. 2008) (stating that the plaintiff's low burden at the prima-facie-showing stage of the *McDonnell Douglas* analysis, rests upon the principle that an employer's "invidious intent" may be presumed to arise from the plaintiff's status as a member of a historically disfavored). As such "[w]hen a plaintiff who is a member of a favored group" (in this instance, males) "alleges disparate treatment, the courts have adjusted the prima facie case to reflect this specific context by requiring a showing of background circumstances which support the suspicion that the defendant is that unusual employer who discriminates against the majority." *Livingston*, 802 F.2d at 1252 (alteration omitted). Thus, "in lieu of showing that he belongs to a protected group," which is normally the first element of a prima facie case of discrimination, in order to establish a prima facie case of "reverse" gender discrimination, Plaintiff must submit evidence of "background circumstances that support an inference that" Defendant discriminates against males. *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1201 (10th Cir. 2006). Alternatively, he may satisfy this requirement by submitting evidence demonstrating that, but for his status as a male, the challenged employment action would not have occurred. *Id.*

## 2.  **The Undisputed Facts Material Relevant to Count IV**

From February 23, 2011 to June 15, 2014, Raul Pardo was the Agency's "Acting Hearing Office Chief." (Doc. 52-4 at 1; Doc. 52 at 4 ¶ 13; Doc. 57 at 2 ¶ 13.) Plaintiff, previously a legal assistant, was promoted to the position of case manager on October 7, 2012. (Doc. 52-4 at 5; Doc. 52-8 at 1; Doc. 52 at 4 ¶ 15; Doc. 57 at 2 ¶ 15.) Mr. Pardo supported Plaintiff's promotion to case manager over a competing female applicant. (Doc. 52-4.) From 2012 until 2013, there were three case managers under Mr. Pardo's supervision—Plaintiff, and two female colleagues, Pilar Chavez, and Shannon Rogers. (Doc. 52-8 at 7; Doc. 52-4 at 2; Doc. 52-5 at 2; Doc. 52 at 4 ¶ 15; Doc. 57 at 2 ¶ 15.) In 2013, Ms. Rogers was promoted (and thereby became Plaintiff's supervisor), and Ms. Chavez was transferred, which left Plaintiff as the sole case manager during Mr. Pardo's tenure as Hearing Office Chief. (Doc. 52-4 at 2; Doc. 52-5 at 2-3; Doc. 52 at 4 ¶ 16; Doc. 57 at 3 ¶ 16.)

From June 2013 to June 2014, Ms. Rogers was Plaintiff's "first line" supervisor and, as such, she conducted Plaintiff's performance evaluation but was not involved in the monetary award process. (Doc. 52-5 at 2-5; Doc. 52 at 4-5 ¶ 18; Doc. 57 at 3 ¶ 18.) During her tenure as Plaintiff's supervisor, Ms. Rogers "counseled" Plaintiff regarding both performance and conduct related issues such as deleting electronic folder transactions, not updating claimant files, not being prepared for his assigned ALJs hearings, insubordination, and bullying other employees while assigned as the Officer in Charge during a three-day management absence. (Doc. 52-5 at 6; Doc. 52 at 5 ¶ 19; see Doc. 57 at 19.) This "counseling" occurred in 2013. (Doc. 52-5 at 6.)

In 2014, after a "PACS Performance Discussion" during which Ms. Rogers evaluated Plaintiff's work performance, Plaintiff drafted a written response to Ms. Rogers concerning the substance of the evaluation. (Doc. 57 at 9-12.) In his response, Plaintiff indicated his

disagreement with Ms. Roger's evaluation of his work performance in a number of categories. (Id.) Plaintiff also conveyed his impression that Ms. Rogers' "personal opinions" of him were "negative" as evidenced by her "negative comments and accusations [which were] demeaning and without cause" and were, according to Plaintiff, a reflection of Ms. Rogers' "lack of supervisory skills." (Doc. 57 at 12.)

Agency employees, including Plaintiff, are represented by the American Federation of Government Employees pursuant to a national collective bargaining agreement between the Federation and the Social Security Administration. (Doc. 52-6; Doc. 52 at 5 ¶ 21; Doc. 57 ¶ 21.) Article 17 of the Collective Bargaining Agreement governing "Monetary Awards" provides, in relevant part, that "[r]ecognition of employees through monetary awards reflects the parties' efforts to promote continuous quality service and to recognize employee contributions to Agency performance." (Doc. 52-6.) The monetary awards "program provides for two forms of monetary recognition (Recognition of Contribution (ROC) and Exemplary Contribution or Service Award (ECSA)) enabling the award recipient to be recognized in a meaningful manner." (Doc. 52-6; Doc. 52 at 5 ¶¶ 24-25; Doc. 57 at 3 ¶¶ 24-25.)

Pursuant to the Collective Bargaining Agreement, a ROC award, which is based on individual performance and contributions to the Agency's mission, may be in the form of a Quality Step Increase or cash. (Doc. 52-6 at 5; Doc. 52 at 6 ¶ 32; Doc. 57 at 32.) To be eligible for a cash ROC award, an employee "must have a rating of record with an Element Average of at least 4.0; and to be eligible for a Quality Step Increase, he must have "a rating of record with an Element Average of 5." (Doc. 52-6; Doc. 52 at 6 ¶ 33; Doc. 57 at ¶ 33.) In the years 2012, 2013, and 2014, Plaintiff's "Element Average" was 3.5 and, therefore, he was not eligible for a ROC award. (Doc. 52-8 at 2, 4, 7; Doc. 52 at 6-7 ¶¶ 35-39; Doc. 57 at 4 ¶¶ 35-39.)

To be eligible for an Exemplary Contribution or Service Award (ECSA), which is a cash award designed to recognize individual contributions to group achievement and performance or extraordinary acts performed while on duty, an employee must have an "Element Average" of at least 3.0. (Doc. 52-6 at 5-6.) Plaintiff received an ECSA monetary award of $200 in 2012; he did not receive an ECSA monetary award in 2013; and he received an ECSA monetary award of $200 in 2014. (Doc. 52-8 at 2, 4-5, 7; Doc. 52 at 6 ¶ 34, 7 ¶¶ 36, 38; Doc. 57 at 3-4 ¶¶ 34, 36, 38.) In 2014, the budget for ESCA awards was $1,372 (pursuant to the collective bargaining agreement each award may be between $200 and $800), and Administrative Law Judge Barry Robinson nominated five individuals (two females and three males) to receive the awards. (Doc. 52-6 at 6; Doc. 52-7; Doc. 52-10; Doc. 52-11 Doc. 52 at ¶ 31; Doc. 57 at 3 ¶ 31)

Plaintiff does not know the amount of the monetary awards given to his female colleagues in any relevant year, and he does not know what their performance evaluations were. (Doc. 52-8 at 2-3, 5, 7; Doc. 52 at 7 ¶ 40; Doc. 57 at 4 ¶ 40.) Mr. Pardo was not involved in the monetary awards process and he does not know the amount of the monetary awards given to any of the Agency's employees. (Doc. 52-4 at 3-4.) According to Mr. Pardo and Ms. Rogers, decisions regarding eligibility for, and the amount of, awards given to the Agency's employees were made by Ms. Kallio. (Doc. 52-4 at 3; Doc. 52-5 at 4; Doc. 52 at 5 ¶ 20, see Doc. 57 at 3 ¶ 20.) In the years 2012 through 2014, the Agency's staff was comprised of a greater number of women than men. (Doc. 52-4 at 2; Doc. 52 at 4 ¶ 17; Doc. 57 at 3 ¶ 17.)

On one occasion, Mr. Pardo mentioned to a colleague that he had a television to get rid of. (Doc. 52-5 at 7; Doc. 57 at 14.) Ms. Rogers learned about the television from Mr. Pardo's colleague and asked Mr. Pardo for the television. (Id.) According to Ms. Rogers the television

was of "minimal value." (Id.) Plaintiff helped Ms. Rogers carry the television to her car from Mr. Pardo's car. (Id.)

### 3. Plaintiff Has Not Established a Prima Facie Case of Gender Discrimination as Alleged in Count IV

As noted earlier, as a male claiming gender discrimination, Plaintiff bears the burden of demonstrating that the Agency is an "unusual employer" that discriminates against males, or that but for his status as a male, he would have received a "bonus" in 2014.[10] *Argo*, 452 F.3d at 1201. In this regard, Plaintiff points to the fact that female staff outnumbered the male staff at the Agency in the years 2013, 2013, and 2014. (Doc. 57 at 17) He also argues that Mr. Pardo "promoted his favorite female employees and gave them substantial bonuses" and raises and points to the fact that Ms. Rogers was given "a large TV" by Mr. Pardo as "a personal gift." (Doc. 57 at 4-5 ¶ 42.)

Defendant argues, and the Court agrees, that the fact that female staff members outnumbered males is insufficient to support an inference that the Agency discriminates against men. *See Held v. Ferrellgas, Inc.*, 505 F. App'x 687, 691 (10th Cir. 2012) (unpublished) (holding that the fact that the plaintiff was the only man among a five-person team did not support an inference of "reverse gender discrimination"). (Doc. 52 at 15.) There is no evidence in the record to support an inference that the male-female ratio of staff members at the Agency is the result of discriminatory animus toward males, and without some evidentiary support, it would be unreasonable to assume that it was. *See Argo*, 452 F.3d at 1201 (holding that the plaintiff had failed to establish any circumstances that might justify a presumption of "reverse sex

---

[10] Defendant argues, and Plaintiff does not refute, that the only "adverse employment action" properly before the Court is whether Plaintiff was the victim of unlawful employment discrimination when, in 2014, he did not receive a "bonus." (Doc. 52 at 11.) Although it is not entirely clear, it appears to the Court that the "bonus" issue arises from Plaintiff's contention that, although he received a $200 ECSA award in 2014, he should have received a more substantial sum. (See Doc. 52-8 at 7.) Further, although Count IV of the Complaint also refers to "promotions" and "extra volunteer duties," Plaintiff does not provide admissible evidence demonstrating that he applied for, but was not selected for a particular promotion or an "extra volunteer" duty.

discrimination" where "by all accounts [the employer] hired plenty of men" and the plaintiff had not introduced "a whit of statistical or even anecdotal evidence that men suffered adverse treatment as a class in the workplace"). Additionally, although Plaintiff argues that Mr. Pardo promoted his "favorite female employees," he provides no admissible evidence to support this contention. It is however undisputed that Mr. Pardo also promoted Plaintiff, and that he did so under circumstances that belie rather than support an inference of discriminatory animus against males—*i.e.*, he promoted Plaintiff instead of a competing female applicant. Finally, the fact that Ms. Rogers acquired Mr. Pardo's television—an object of "minimal value" that Mr. Pardo was reportedly getting rid of, and as to which there is no evidence that Plaintiff or any of his male colleagues expressed interest, does not give rise to a reasonable inference of employment-related gender discrimination.

Nor does Ms. Roger's evaluation of Plaintiff in 2014 (as evidenced by Plaintiff's written response to Ms. Rogers) give rise to an inference of gender discrimination. Based upon Plaintiff's response to the 2014 evaluation, it appears that Ms. Rogers found Plaintiff's work performance unsatisfactory in terms of: his listening and responding appropriately to feedback from the public, co-workers and managers; his defiance toward management directives and feedback; his preparedness; his job knowledge; his ability to complete work tasks within the expected time frame; and his professionalism and courtesy. (Doc. 57 at 9-12.) Notably, Plaintiff's response did not raise or allude to an issue of gender-based animus or otherwise reflect that Plaintiff believed, at that time, that Ms. Rogers was unfairly evaluating his performance because he is male. Thus, while this evidence indicates that Ms. Rogers was not satisfied with Plaintiff's work-place conduct and his work performance, it does not give rise to an inference that she was motivated by gender-based animus. *See e.g. Kline v. Utah Anti-*

*Discrimination & Labor Div.*, 418 F. App'x 774, 781-82 (10th Cir. 2011) (unpublished) (holding, in the context of a "hostile work environment" claim, that a supervisor's "caustic" and "harsh" comments about an employees work performance demonstrated that the supervisor found the employee's work product deficient, but did not give rise to an inference of gender discrimination); *Lyons v. Red Roof Inns, Inc.*, 130 F. App'x 953, 955 (10th Cir. 2005) (unpublished) (concluding that in the absence of evidence that the male plaintiff was "similarly situated" to female employees in terms of job performance, the fact that he was terminated for repeated failure to follow his employer's policies and procedures was insufficient to establish a prima facie case of "reverse gender discrimination"); *Beams v. Norton*, 335 F.Supp.2d 1135, 1150-51 (D. Kan. 2004) (holding that a male employee's written notice to his female supervisor indicating that he was resigning "as a result of her continued misrepresentation of the truth regarding his work and his intentions in his work," but made no reference to sex discrimination demonstrated a personality conflict between the employee and his supervisor, but did not establish a prima facie case of "reverse sex discrimination").

Plaintiff also argues, without admissible evidentiary support, that Ms. Rogers used several derogatory terms—"'fish lips', 'ghetto', 'fools', 'whores', 'donkey', 'idiot', 'worthless', 'stupid', [and] 'fu**in idiot'" in reference to "co-workers." Plaintiff has neither argued, nor submitted evidence demonstrating, that Ms. Rogers' referred to Plaintiff in these terms or that she used them in reference to male, but not female co-workers. Thus, even if Plaintiff had produced admissible evidence demonstrating that Ms. Rogers had in fact referred to her co-workers in these terms, this, without more, would only support a reasonable inference that Ms. Rogers was a difficult supervisor or colleague, but not that she treated male employees less favorably than female employees. *See Beams*, 335 F. Supp. at 1151 (stating that evidence that a supervisor is

difficult or engenders conflict does not, without more, give rise to an inference that she was motivated by gender bias); *Peterson v. Utah Dep't of Corr.*, 301 F.3d at 1188 (stating that unconscionable rudeness that is not driven by class-based discriminatory animus is not actionable under Title VII).

Finally, although Plaintiff's claim of gender discrimination includes an allegation that female employees were chosen for "extra volunteer duties," he has submitted no admissible evidence to support this aspect of his claim.  (Doc. 37 at ¶ 61.)  Plaintiff's conclusory allegation concerning extra volunteer duties is insufficient to survive Defendant's summary judgment motion.  *See Kidd v. Taos Ski Valley, Inc.*, 88 F.3d 848, 853 (10th Cir. 1996) (stating that a nonmoving party cannot overcome a motion for summary judgment by relying merely on conclusory allegations presented in the pleadings).

In sum, Plaintiff has not submitted admissible evidence demonstrating, or giving rise to an inference, that the Agency (by its supervisory staff) discriminated against male employees. *Argo*, 452 F.3d at  1201.  Nor has he submitted admissible evidence to show that, but for his status as a male, he would have been treated more favorably, in general, or, specifically, that he would have received a "bonus" or a more substantial ECSA award in 2014.  *Id.*  As such, Plaintiff has failed to satisfy the first element of a prima facie case of "reverse" gender discrimination.  *Argo*, 452 F.3d at 1201.  Accordingly, the Court recommends that summary judgment be granted in favor of Defendant as to Count IV on the ground that Plaintiff has not established a prima facie case of gender discrimination.  *See Celotex Corp.*, 477 U.S. at 322 ("[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial" and entitles the moving party to judgment as a matter of law).

### 4. **Defendant's Motion for Summary Judgment as to Count V**

In Count V of the Complaint, Plaintiff raises a gender based harassment claim alleging that he was subjected to gender-based harassment that was "so severe and pervasive . . . to create a work environment that a reasonable person would consider intimidating, hostile or abusive." (Doc. 37 at 66.)  The "offensive conduct" giving rise to these claims involved "offensive jokes, slurs, epithets or name calling, ridicule or mockery, insults or put-downs, offensive objects or pictures, and interference with work performance."  (Doc. 37 at 66-67.)  The scope of Plaintiff's harassment/hostile work environment claim in Count V, is further evident from the formal EEO compliant he filed.  For instance, Plaintiff complained of disparaging comments about him by his supervisors and purported favoritism toward female employees—including that Ms. Rogers was given a bouquet of flowers, a card, and a gift after she was promoted to supervisor, but Plaintiff "got not so much as a handshake"; a female employee was permitted to attend classes during work hours without taking leave, but on two occasions Plaintiff was asked to disclose his whereabouts during his official break time; and after Plaintiff was promoted he was not trained for over a year while new hires were allowed to attend formal training, received temporary assignments, and conducted training and interviews.  (Doc. 52-2 at 6-7.)

As an initial matter, the Court observes that Plaintiff's harassment and his hostile work environment allegations raised in Count V are interrelated and as such Defendant addresses the merits of these claims together.  (Doc. 52 at 20-26.)  Indeed, both the Supreme Court and the Tenth Circuit Court of Appeals have recognized, as a general proposition, that gender-based harassment leading to a hostile work environment is actionable under Title VII.  *See Faragher v. City of Boca Raton*, 524 U.S. 775, 780 (1998) (examining the circumstances under which an employer may be held liable under Title VII for the acts of a supervisory employee whose sexual

harassment of subordinates created a hostile work environment amounting to employment discrimination); *Penry v. Fed. Home Loan Bank of Topeka*, 155 F.3d 1257, 1261 (10th Cir. 1998) (examining the plaintiffs' Title VII sexual harassment claims which were based on a hostile work environment theory). Here, Plaintiff's allegations may reasonably be viewed as submitting the theory that women employed at the Agency were treated so favorably and, in comparison, because he is a man, Plaintiff was subjected to harassing conduct that caused the workplace to be permeated with gender-based hostility.

To prevail on a gender-based harassment claim based on a hostile work environment theory, the Plaintiff must show that "the workplace is permeated with discriminatory intimidation, ridicule and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Penry*, 155 F.3d at 1261. "The plaintiff must produce evidence that [he] was the object of harassment because of [his] gender." *Id.* Further, the plaintiff must show "that the environment was both objectively and subjectively hostile[.]" *Id.*

As to the allegations in the Complaint, Plaintiff has provided no admissible evidence[11] (nor has he provided any argument in response to Defendant's motion for summary judgment) demonstrating that Defendant subjected him to harassment in the form of "offensive conduct" including "offensive jokes, slurs, epithets or name calling, ridicule or mockery, insults or put-

---

[11] The Court recognizes that Plaintiff is pro se and has, accordingly, afforded him some leniency and construed his pleadings and his arguments liberally. *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991) ("A pro se litigant's pleadings are to be construed liberally and held to a less stringent standard than formal pleadings drafted by lawyers."). However, Plaintiff's pro se status does not relieve him from following the rules of civil procedure that are binding upon all litigants. *Kay v. Bemis*, 500 F.3d 1214, 1218 (10th Cir. 2007). Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, in order to overcome a motion for summary judgment the nonmovant must go beyond the pleadings and set forth specific facts—such as affidavits, depositions, declarations, or stipulations—that would be admissible in evidence in the event of a trial. Conclusory, self-serving affidavits do not satisfy this standard, *Hall*, 935 F.2d at 1111, nor do unsupported conclusory allegations, *L&M Ents., Inc. v. BEI Sensors & Sys. Co.*, 231 F.3d 1284, 1287 (10th Cir. 2000). Pursuant to these standards, the arguments and conclusory allegations that comprise Plaintiff's unsworn EEO complaint do not constitute evidence sufficient to create a genuine issue of material fact in the summary judgment context.

downs, offensive objects or pictures" that interfered "with work performance" as alleged in the Complaint. Nor, by extension, has he submitted evidence that he was so harassed *because of his gender*. *See e.g., Penry*, 155 F.3d at 1261 ( "The plaintiff must produce evidence that she was the object of harassment because of her gender."); *see Chavez v. N.M.*, 397 F.3d 826, 833 (10th Cir. 2005) (same); *see also Peterson v. Utah Dep't of Corr.*, 301 F.3d 1182, 1188 (10th Cir. 2002) (stating that Title VII is not violated by an employer's unconscionably rude and unfair treatment of an employee that is not driven by the employee's membership in a protected class); *Gross.*, 53 F.3d at 1543-45 (10th Cir. 1995) (concluding that vulgarity and harsh criticism of an employee's work performance that is not "sexual or gender specific" does not support a gender discrimination claim).

Furthermore, as to the more expansive allegations of workplace harassment and hostility alleged in his EEO Complaint, Plaintiff failed to submit admissible evidence that gives rise to a reasonable inference that the conduct of which he complains was driven by gender-based animus. *Penry*, 155 F.3d at 1261. For example, in his formal EEO complaint, Plaintiff asserted that there existed a pattern of favoritism and gender discrimination evidenced by the fact that after he was promoted to case manager, he was not sent to training for over a year, he was given training via video instead of being sent to formal training, and his supervisor refused to accommodate a leave request that conflicted with two training days. Plaintiff complained, further, that "ALL NEW EMPLOYEES . . . were given formal training"; that ALJ Pardo was sent to HQ to conduct interviews; and that Shannon Rogers was sent to formal training for three job functions. However, there is no evidence in the record to suggest "all" of the new employees to whom Plaintiff referred were females and it is clear from the record ALJ Pardo was male, and Ms. Rogers was female. Thus, even assuming that Plaintiff could present admissible evidence to

support the contentions made in his EEO complaint, this evidence supports a theory Plaintiff was treated less favorably than employees of both genders, but it does not support the notion that this less favorable treatment stemmed from gender-based animus. *See Oncale v. Sundowner Offshore Servs. Inc.*, 523 U.S. 75 81 (1998) ("The critical issue [in a Title VII claim] is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.").

Likewise, Plaintiff complained that he was treated less favorably than a young female employee who was allowed to attend college classes during work time, whereas Plaintiff was questioned about his whereabouts during his breaks; he complained that Ms. Rogers was celebrated—*i.e.* she was given a gift, flowers, and a card when she was promoted, whereas Plaintiff did not even receive a handshake when he was promoted; he complained that ALJ Pardo displayed favoritism to Ms. Rogers, but complained about Plaintiff's work, and failed to thank him or give him an "atta boy" when Plaintiff did the work of a supervisor and all of the legal assistants during a 2013 furlough; and he complained that ALJ Pardo made several rude and insulting comments about him. (Doc. 52-2 at 4-5.) As with the aforementioned incidents that comprised Plaintiff's formal EEO Complaint, even assuming that Plaintiff could provide admissible evidence supporting these allegations, the fact that Plaintiff's supervisors monitored him more closely, or treated him less favorably than two of his female colleagues, or failed to overtly appreciate him in the same manner or to the same degree as Ms. Rogers does not rise to the level of "intimidation, ridicule and insult" required to demonstrate the existence of an abusive working environment under Title VII. *See generally Faragher*, 524 U.S. at 788 (1998) ("[I]solated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment"); *Trujillo v. Univ. of Colo. Health Sciences Ctr.*, 157 F.3d

1211, 1214 (10th Cir. 1998) (holding, in the context of a race discrimination claim, that evidence of a collection of unrelated incidents in which the plaintiff and his supervisor were at odds, but the plaintiff was not subjected to race-based offensive utterances, fell short of showing pervasive or severe harassment); *Bolden v. PRC, Inc.*, 43 F.3d 545, 551 (10th Cir. 1994) (stating that for a racially hostile work environment claim to survive summary judgment, the plaintiff must show more than a few isolated incidents of racial enmity"). Furthermore, even if the conduct did rise to that level, in light of the substantial uncontroverted evidence in the record of Plaintiff's fraught relationship with his colleagues and supervisors, and in the absence of any evidence (beyond Plaintiff's speculation) that Defendant's actions were motivated by gender-based animus, these allegations do not give rise to a reasonable inference that Defendant's alleged imbalanced treatment of Plaintiff as compared with his colleagues was motivated by his gender rather than personality conflicts between Plaintiff and his supervisors. *See Penry*, 155 F.3d at 1262 (stating that the court should consider the record as a whole in evaluating gender-based harassment and hostile work environment claims); *O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1095 (10th Cir. 1999) (stating that a hostile environment sexual harassment claim requires the plaintiff to demonstrate a "reasonable nexus" between a hostile work environment and gender-based animus) *Beams*, 335 F. Supp. at 1151 (stating that evidence that a supervisor is difficult or engenders conflict does not, without more, give rise to an inference that she was motivated by gender bias); *Peterson*, 301 F.3d at 1188 (stating that unconscionable rudeness that is not driven by class-based discriminatory animus is not actionable under Title VII).

In light of the foregoing, the Court recommends summary judgment in favor of Defendant as to Count V. Although, not the basis for recommending that summary judgment be granted on this count, the undersigned notes that Plaintiff, having failed to respond to Defendant's argument

that it is entitled to summary judgment on the merits of this claim (Doc. 52 at 20-26), has himself effectively conceded the matter.

**IV.** **CONCLUSION**

For the reasons stated herein, the undersigned recommends that:

**(1)** *Defendant's Motion to Dismiss Plaintiff's Claims for Violation of his Weingarten Rights (Count VI and for Violation of the 14th Amendment (Count VII)*, filed January 12, 2018, be **GRANTED**;

**(2)** *Defendant's First Motion for Summary Judgment on Plaintiff's Claims for Race Discrimination (Count I)*, filed on January 12, 2018 (Doc. 49), be **GRANTED**; and

**(3)** *Defendant's Provisional Second Motion for Summary Judgment on Plaintiff's Claims for Retaliation (Count III), Gender Discrimination (Count IV) and Hostile Work Environment (Count II/Harassment (Count V)*, filed January 16, 2018 (Doc. 52), be **GRANTED**.

---

**THE PARTIES ARE NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.**

---

_____
KIRTAN KHALSA
United States Magistrate Judge